Elliot Hales (SBN 293535)
hales.elliot@dorsey.com
Brett Foster (*pro hac vice* forthcoming)
foster.brett@dorsey.com
**DORSEY & WHITNEY LLP**
111 S. Main Street, Suite 2100
Salt Lake City, UT 84111-2176
Telephone: (801) 933-4069
Fax: (801) 933-7373

Ian Swan (*pro hac vice* forthcoming)
swan.ian@dorsey.com
**DORSEY & WHITNEY LLP**
1401 New York Avenue NW, Suite 900
Washington DC, 20005
Telephone: (202) 442-3000
Fax: (202) 442-3199

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF CALIFORNIA**
**SACRAMENTO DIVISION**

| | |
|---|---|
| ADDIUM, INC., a Washington corporation, and METER GROUP, INC. USA, a Washington corporation,<br>        Plaintiffs,<br><br>    v.<br><br>TROLMASTER AGRO INSTRUMENTS CO., a Hong Kong corporation, THINKGROW AGRICULTURAL TECHNOLOGY, INC., a California corporation, MANGO TROL LABS, INC., a California corporation, MANGO TECH STORE, INC., a California corporation, and MANGO TROL, INC., a California corporation,<br>        Defendants. | CASE NO:<br><br>JUDGE: _____<br><br>**COMPLAINT FOR:**<br><br>1. **Patent Infringement;**<br>2. **Copyright Infringement** |

Plaintiffs Addium, Inc. and METER Group, Inc. ("Plaintiffs"), by and through its counsel, for its claims for relief against Defendants TrolMaster Agro Instruments, Co. ("TrolMaster"), ThinkGrow Agricultural Technology, Inc. ("ThinkGrow"), Mango Trol Labs, Inc. ("Mango Trol Labs"), Mango Tech Store, Inc. ("Mango Tech"), and Mango Trol, Inc. (collectively, "Defendants") alleges as follows:

**PARTIES**

1.      Plaintiff Addium is a Washington corporation with its principal place of business at 1300 NE Henley Court, Suite 5, Pullman, Washington, 99163-5662.  Addium is a leader in the development of agricultural technologies.

2.      Plaintiff METER Group, Inc. is a Washington corporation with its principal place of business at 2365 N.E. Hopkins Ct., Pullman, Washington, 99163-5601. METER Group, Inc. is a global leader in the development of agricultural technologies.

3.      Upon information and belief, Defendant TrolMaster is a Hong Kong company with its principal place of business at Room 02-03, 25F, Two Portside, 9 Pat Tat Street, San Po Kong, Kowloon, Hong Kong.

4.      Upon information and belief, Defendant ThinkGrow is a California corporation with its principal place of business at 7991 Folsom Boulevard, Suites 1 & 2, Sacramento, California 95826.

5.      Upon information and belief, Defendant Mango Trol Labs is a California corporation with its principal place of business at 5001 Florin Perkins Road, Sacramento, California 95826.

2

6.    Upon information and belief, Defendant Mango Tech is a California corporation with its principal place of business at 7991 Folsom Boulevard, Suites 1 & 2, Sacramento, California 95826.

7.    Upon information and belief, Defendant Mango Trol, Inc. is a California corporation with its principal place of business at 5081 Florin Perkins Road, Sacramento, California 95826.

## JURISDICTION AND VENUE

8.    This is a copyright and patent dispute arising under Titles 17 and 35 of the United States Code.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

9.    This Court has personal jurisdiction over Defendants because all Defendants except TrolMaster are incorporated in California and each is headquartered in this judicial district.

10.    This Court has personal jurisdiction over TrolMaster pursuant to Fed. R. Civ. P. 4(k)(2) because TrolMaster is not incorporated in any state, and while it has no known facilities or employees in the United States, it nevertheless has minimum contacts with the United States and California such that the maintenance of this suit does not offend traditional notions of fair play and substantial justice.

11.    Defendant TrolMaster is a foreign entity that purposefully avails itself of the privilege of conducting business within the United States. Although TrolMaster is not incorporated in the United States and maintains no direct facilities or employees stateside, it systematically and continuously directs its commercial activities at the domestic market.

12.    Specifically, on information and belief, TrolMaster has entered into distribution and service agreements with the other named Defendants to act as domestic distributors and product

4912-4904-5680\5

support channels for TrolMaster products in the United States, including the products at issue in this Complaint.

13. By contracting with domestic suppliers of its products, and through provision of those supplies, Defendant TrolMaster has purposefully directed its activities at the United States and intends to serve the domestic market. TrolMaster placed its products into the stream of commerce with the explicit expectation, design, and intent that they would be aggressively marketed and purchased by consumers throughout the United States, including within this District.

14. The claims asserted in this Complaint arise directly out of and relate to TrolMaster's purposefully directed business activities and its placement of products into the domestic stream of commerce.

15. Venue is proper in this judicial district for Defendant TrolMaster pursuant to 28 U.S.C. § 1391(c)(3) because Defendant TrolMaster is an entity not resident in the United States and may therefore be sued in any judicial district.

16. Venue is proper in this district under 28 U.S.C. § 1391 for all other defendants because each is headquartered and/or maintains substantial operations and employees in this venue.

## GENERAL ALLEGATIONS

### Agriculture and Substrate Sensors

17. Agriculture has come a long way from its humble origins—a farmer planting seeds in the ground and relying on fickle rain patterns to ensure the seeds would mature into a harvestable crop. Modernly, farmers increasingly harness local water resources—reservoirs, rivers, and underground aquifers—to irrigate their crops, providing their crops with what they believe to be the right amount of water at the right time to increase crop yields.

4

4912-4904-5680\5

18.     But farmers were and are a diaspora—necessarily distant from one another because each requires large acreage to profitably grow and harvest their crops.  What one farmer learns through trial and error about his land may not apply to his neighbor's land, and likely doesn't apply to land beyond the horizon.  As a result, there have been as many opinions about when and how to water a crop as there are farmers watering those crops.

19.     In the early 1980s, Dr. Gaylon Campbell, then a soil scientist at Washington State University, saw an immense opportunity to optimize irrigation practices to increase crop yields, decrease water waste, increase farmer profits, drive down consumer food prices, and help the food supply keep up with a rapidly growing global population.

20.     To achieve this lofty goal, Dr. Campbell knew that emerging advances in computer hardware and software would play a critical role.  Dr. Campbell's vision may appear obvious with the benefit of 45 years of hindsight, but was an elegant and revolutionary idea at the time: if one could deploy sensors in a farmer's field, relay the data and measurements of these sensors to a central computer, and compare these data to observed crop yields, then one could cut through the cloud of anecdotes and opinions and know, conclusively, when and how to water a crop to ensure maximum harvests.

21.     In 1983, Dr. Campbell founded Decagon Inc. and released the company's first product, a water potential instrument, to help agronomists and farmers better understand the environments in which they grow their crops and how to irrigate those crops.

5

22.    From that time until present, Dr. Campbell and his companies[1] have been laser-focused on developing the sensors, tools, and data analysis tools to help farmers understand their land and what that land needs, in real-time, to deliver optimal crop yields.

23.    In the 1980s and 1990s, METER Group provided a legacy class of sensors a farmer could insert into the soil of their field to measure the volumetric water content—the VWC—of that soil. As the name indicates, the VWC of surrounding soil is a measure of the volume of water found in an area of soil.

24.    An example of this legacy class of sensors is pictured below, and it employed "Time Domain Reflectometry" technology ("TDR") to measure the VWC of soil surrounding the sensor. TDR sensors operate on a simple principle that requires incredibly precise timing—the sensor sends electronic pulses down the length of the prongs, then measures how long it takes for those pulses to "bounce" back from the end of the prongs back to the top.  In a sense, these devices measure how long it takes an "echo" to return to the source.

25.    The amount of time it takes for the pulses to bounce back is important because engineers discovered that the speed of the pulse traveling down and back the length of the prong directly related to the moisture in the environment surrounding the prongs—the drier the environment, the faster the pulse travels. Thus, TDR sensors installed strategically around a farmer's land would enable that farmer to know precisely how much water was in his soil, then adjust their irrigation to the levels that would ensure higher crop yields.

---

[1] Decagon Inc. was changed its name to "METER Group Inc. USA" in 2017. Plaintiffs use "METER Group" to refer to either or both companies throughout this Complaint.

4912-4904-5680\5



26.     Another class of agricultural sensors are what are known as "capacitance" sensors. Capacitance sensors, pictured below, appear outwardly like TDR sensors, but operate on distinct electrical principles.



27.     Rather than send pulses down and back the length of the prongs, capacitance sensors push a high-frequency electrical signal back and forth between its prongs. This creates an invisible electromagnetic field that extends a few inches into the surrounding soil. If the soil is completely dry, the electrical signal oscillates (swings back and forth) at its normal, rapid

4912-4904-5680\5

frequency. As the soil gets wetter, the water drastically increases the "capacitance" (the charge-storing ability) of the soil. This extra capacity acts like a heavy weight on a swinging pendulum, dragging down the frequency of the electrical signal.

28.     Like TDR sensors, this observed difference in performance of the sensor signals—less capacitance when dry, more capacitance when wet—allows the farmer to measure the VWC of their soil by how quickly the signal oscillates.

29.     Many capacitance sensors were able to use the hardware of the sensor to measure the electrical conductivity ("EC") of the soil. To do this, the sensor performed a different electrical measurement.  The sensor would deliver an electrical charge through one or more of the prongs of the sensor, sending that charge through the surrounding soil, and then measure the charge received by an adjacent prong.  Based on the sent and received electrical signals, the sensor measures exactly how much electrical resistance the current encountered on that short journey. With this information, the sensor can convert that resistance reading into an EC measurement.

30.     In ordinary farming—outdoor environments and fairly low rates of fertilizer use—capacitance sensors performed adequately for most applications, providing a relatively cheap and reliable solution to inform a farmer of the current VWC and EC (i.e., moisture and fertilizer) conditions across their land.

**Existing Sensors Fail in Indoor Cultivation Environments**

31.      Around 2010, a new agricultural challenge emerged. States began legalizing the cultivation and sale of cannabis for medical and recreational use.

32.     Due to a combination of factors—the specific needs of cannabis cultivation, market forces demanding plants that yield high concentrations of desired components (e.g., THC or

8

4912-4904-5680\5

specific terpenes), strict industry regulations, liability concerns—the majority of licensed cannabis cultivators elected to grow their crops indoors, under closely monitored conditions.

33.     In order to achieve desired growing outcomes, an indoor cannabis cultivator will closely monitor and adjust the conditions in which a plant grows. Primary among these variables are, as one might expect, the moisture provided to the plant, the fertilizer provided to the plant, the ambient temperature, and the amount and type of light provided to the plant. Additionally, cannabis cultivators have found that adjusting these inputs at various times of day and at various times in the life cycle of the plant can result in enormous variations in the harvestable content of the plants and, with those variations, significant swings in the profitability of the crop.

34.     An example of the foregoing is the concept of "drybacking" the crop—deliberately and materially reducing the water available to the plant at a specific time in the growing cycle to cause a desired result in the growth of the plant.  Another example is "stacking" (materially increasing) the fertilizer available to the plant at a specific time in its life cycle, again with the intent of securing a desired growing outcome. But, because parching or "stacking" the fertilizer of a plant, if done incorrectly, can harm the plant, cultivators need an accurate idea of the state of the moisture and fertilizer contents of their crops.

35.     In these extreme growing environments, METER Group identified a shortcoming of existing capacitance sensors—while these sensors worked well to measure the moisture and fertilizer levels in "ordinary" agricultural environments—outdoor, soil-based, low-fertilizer conditions—the accuracy of the measurements degraded significantly in indoor cannabis growing environments, where cultivators were skipping soil altogether,[2] using as much as ten times as much

---

[2] Many growers use an inert growing medium like rockwool or coconut husks.

4912-4904-5680\5

fertilizer to grow their crops than is ordinary in outdoor applications, and deliberately parching and rehydrating their plants at specific times.

36.    In these unique growing conditions, METER Group found that existing capacitance sensors frequently reported VWC and EC values that were wildly different than the actual VWC and EC of the growing medium.  Examples of these findings are below, sourced from Addium marketing materials.

37.    In the first pair of charts, two capacitance sensors (one from GrowLink, the other from METER Group) were used to measure and report VWC in high-fertilizer environments common to cannabis cultivation.  The researchers closely controlled the VWC of the growing environment and compared the reported values from these two sensors to the actual VWC values. They found that the capacitance sensors in high-fertilizer environments common in cannabis growing operations could report accurate VWC measurements (denoted in green) in some conditions, but would frequently fail in others (yellow and red).



38.    Similar shortcomings were found in the EC measurements output by these sensors. In the charts below, green represents fairly accurate measured EC measured values, yellow represents inaccurate measured EC values, and red represents highly inaccurate measured EC

4912-4904-5680\5

values. The "hockey stick" rises in the reported values on the left of each chart (when VWC is low) are wholly divorced from actual EC values which should have stayed horizontal on the appropriate EC value that yielded "green" measurements.



## METER Group Develops a First-of-its-Kind Sensor for Indoor Cultivation

39.     METER Group saw this limitation in industry-standard technology for what it was: an opportunity to apply METER Group's decades of experience in agricultural sensors to develop a sensor that would provide accurate measures of VWC and EC in the extreme growing conditions imposed by indoor cannabis cultivation.

40.     METER Group spent six years researching, testing, and bringing to market a sensor that, for the first time, could accurately measure VWC and EC in the extreme growing conditions common to cannabis cultivation. In the process, in 2022, METER Group changed its name to Addium Inc.,[3]  and invested substantial resources to address the needs of the indoor cultivation industry, and to take to market this first-of-its kind sensor. Addium, in turn, markets this product through its sub-brand, AROYA.[4]

---

[3] In 2022, METER Group also created a second entity, also known as METER Group Inc. (i.e., no "USA" at the end of the corporate name), which today focuses on other agricultural markets.
[4] AROYA is a brand, not a standalone company.

11

41.    A picture of Addium's "TEROS ONE" sensor is below, which is the first agricultural sensor to provide highly accurate VWC and EC values across the extreme growing conditions common to indoor cannabis cultivation.



42.    While this sensor looks like the TDR and capacitance sensors that preceded it, it is actually a "Complex Dialectric Sensor" using a Three Voltmeter Method that dramatically improves on the performance of prior sensors.  Applying this new approach—described more fully below—the TEROS ONE is able to achieve measured VWC and EC values nearly identical to actual VWC and EC values common to cannabis cultivation.

43.    In the chart to the left below, the dotted line represents actual VWC in five different test environments, each with varying levels of salinity common to indoor cannabis cultivation. The five plotted lines represent the TEROS ONE's measurements of VWC in these distinct environments.  As seen in this chart, measured VWC remains in the green, accurate zone across nearly all VWC and EC environments.

4912-4904-5680\5



44.    In the chart above and to the right, the lines show measured EC values as being in the green, accurate zone for nearly all VWC and EC growing environments, and no false "hockey stick" readings common to capacitance sensors in low-moisture environments.

**METER Group Secures Patent Protection for its First-of-its-Kind Sensor**

45.    Recognizing that this sensor embodied six years of hard-won innovation, and which provided results unmatched anywhere in the industry, METER Group sought and received patent protection for its breakthrough in agriculture sensor technology. This patent is attached to the complaint as **Exhibit A**, US Patent Number 11,415,612 (the "'612 Patent").

46.    The '612 patent discloses the problems described *supra* in this Complaint— "existing technologies are known to perform satisfactorily as long as soil salinity is low or moderate," but have "poor accuracy" in extreme growing conditions.  *See* Ex. A at 1:24-39.

47.    To solve this problem, the '612 discloses and claims the specific Three Voltmeter Method practiced by the TEROS ONE. A representative claim from the '612 Patent is below:

> 1. A complex dielectric sensor for porous media, the sensor comprising:
>
> a voltage source to output a source signal having a source frequency and a source amplitude;
>
> at least two electrodes insertable into a sample medium;

a first reference impedance electrically connected between the signal source and the at least two electrodes;

a second reference impedance electrically connected between the signal source and the at least two electrodes;

a first junction located between the first reference impedance and the second reference impedance;

a second junction located between the second reference impedance and at least one electrode of the at least two electrodes; and

a sensor device configured to measure a first amplitude of a first signal at the first junction, a second amplitude of a second signal at the second junction, and the source amplitude between the signal source and the first reference impedance while the source frequency is output by the voltage source through the first and second reference impedances;

wherein at least one of the first and second reference impedances comprises a reactive circuit element; and

wherein the sensor device is configured to calculate a complex admittance of the sample based on the first amplitude, the second amplitude, and the source amplitude.

48.   In simple, general terms, this claim describes the hardware and operation of the TEROS ONE: send a known electrical signal through a specific set internal hardware obstacles, measure the signal at three specific checkpoints, and use math described and claimed in the patent to ascertain exactly how the surrounding environment (e.g., soil or other growing medium) reacts to electricity by calculating the complex admittance of this surrounding environment. By doing so, the TEROS ONE can determine highly accurate readings for VWC and EC at the same time, and in environments where existing soil sensors are known to fail.

**Addium Builds its New Brand on the Strength of its New Sensor**

49.   While dozens of soil and substrate sensors were and are available for purchase on the market, the TEROS ONE offered value no other sensor could—accurate VWC and EC data in

14

the extreme conditions required by indoor cannabis cultivation.  Accordingly, when Addium launched the TEROS ONE in 2023, it designed, marketed, and priced the sensor as a premium product, as it is able to do what no other sensor can.

50.    The market reception for the TEROS ONE, despite the premium price point, was enthusiastic. Addium has sold millions of dollars of these sensors since they were introduced in 2023, in addition to millions of dollars in recurring revenue from purchasers who have taken licenses to Addium's related software services to manage the data output by the TEROS ONE sensors to make intelligent crop steering decisions in response to the provided VWC and EC data.

**TrolMaster Realizes its Capacitance Sensors Do Not Work for Indoor Cannabis Cultivation**

51.    Indoor cultivators were not the only ones to take notice of Addium's innovations. A primary competitor in the market for hardware and software to support cannabis cultivation operations, TrolMaster, was desperate to solve a huge problem in its product offerings for this market.

52.    Namely, TrolMaster offered two sensors to monitor the content of a growing medium, the WCS-2 (i.e., "Water Content Sensor 2") and WCS-3.  These are pictured below.

4912-4904-5680\5



53.    The WCS-3 (to the right above) is advertised as being specifically focused on VWC measurement, while the WCS-2 is advertised as a 3-in-1 device, measuring VWC, EC, and the temperature of the growing medium.

54.    TrolMaster's WCS-2 User Manual corroborates the problems with accurately measuring VWC and EC described above:

> Water content and EC measurement within the growth media are critically important, however rather difficult to accomplish, . . . [m]easuring water content % is complicated by multiple factors including the grow media type, salt content of the water within the grow media and of course the amount of water being held within the grow media. All of those factors can affect the electrical conductivity (EC) of the grow media which can then affect the water content readings.

**Exhibit B.**

55.    The WCS-2 User Manual also concedes that the product operates through legacy capacitance technology, and so suffers the same inherent performance limitations of that technology in high-EC environments, as described *supra*.

16

4912-4904-5680\5

**How we measure EC**: There are other grow media EC sensors in the market, and most of them use the same principle: Position two (or more) stainless steel probes a certain distance apart, and measure the conductivity (capacitance) of the grow media. If the grow media is saturated with water that is high EC, the grow media will be more electrically conductive. Conversely, if the grow media is saturated with low EC water, the grow media is less conductive. We can measure that difference and then display it as a Grow Media EC level on the NFS-1 and NFS-2 controllers.

The actual Water Content within the growth media can also affect the Water EC reading. As the amount of water within the grow media increases, so does the overall conductivity of the grow media. If you increase the EC of the water being fed to the plants, there'd be an increase in the conductivity of the grow medium. Either one of these conditions will result in an elevated EC reading coming from the WCS-2 sensor. So keep in mind that the EC data coming from the WCS-2 sensor could be affected by the amount of water within the grow medium: EC readings might increase when the grow media is very wet, or the EC will decrease when the grow media is very dry.

*Id*. at 5-6.

56.    Despite acknowledging that the inherent limitations of its sensor in the very environments its customers would deploy them, TrolMaster marketed its product to indoor cannabis cultivators, seemingly hoping that the customers would accept the inaccurate readings output by those sensors in the conditions just described.

57.    Customer reception of these products was dismal.    Below is a collection of statements from people purporting to have purchased and used the WCS-2 and WCS-3 products, showing their dissatisfaction with those products.

17

4912-4904-5680\5



58.    The imprecise operation of the WCS-2 and WCS-3 sensors were not isolated to the purchasers of TrolMaster's sensor products. On information and belief, TrolMaster distributes its products in the United States through Mango Trol, Inc., who sells TrolMaster products through the Mango Tech Store Inc. entity and storefront in Sacramento, California.

---

[5] https://www.instagram.com/p/DXQWqL2Eg5U/
[6] https://www.instagram.com/p/DYzixldG3LC/
[7] https://www.instagram.com/p/DXXa9bGgYpa/
[8] *Id.*

4912-4904-5680\5

59. On information and belief, these entities are owned in whole or in part by Alejandro "Alex" Villegas, who holds himself out as CEO of the Mango family of companies named in this Complaint.

60. Mr. Villegas also holds himself out online as "Miami Mango" including on Instagram under the user handle "miami_mango_ca."

61. Mr. Villegas himself admits that the WCS-2 and WCS-3 products were commercial failures: "The WCS 2 and WCS 3 were a thorn in our side. They didn't perform the way we expected, but we learned a lot from it."[9]

**TrolMaster Decides to Purchase, Study, and Knockoff the TEROS ONE Sensor**

62. On information and belief, following the launch of the TEROS ONE in 2023, and knowing that the TrolMaster capacitance sensors were not working for indoor cannabis cultivation, Defendants faced a problem—they would continue lose customers to Addium if they could not develop a sensor that performed as well or better than the TEROS ONE sensors.

63. In 2025, Addium learned for the first time the contours of TrolMaster's plan to compete with the TEROS ONE. On February 21, 2025, Addium received the following tip via its sales intake email:

> See attached UPS label, it has 'AROYA' as the invoice number as well as 'water content sensor and drive' in the description. Having worked for this company, trolmaster, thinkgrow etc, it was frequently my job to purchase goods here and then send them back to HK/China to the factory in Xiamen for reverse engineering or comparison. UPS still uses my personal email account for some reason.[10]

---

[9] https://www.instagram.com/miami_mango_ca/reel/DWRriecP5P2/
[10] All typographical errors in the original.

64.     The referenced document was attached to the tipster's email, and is attached here as **Exhibit C** and excerpted below. In relevant part, the purchaser/shipper appears to be TrolMaster via ThinkGrow at 315 E. Enterprise Dr., Pueblo Colorado, and the recipient to be Jason Chan at TrolMaster Agro Instruments in Hong Kong.



65.     A year later, in a March 29, 2026 email from the tipster, Addium learned that "TrolMaster has completed reverse engineering your sensor and is about to release those to the market . . .".

66.     In response to these tips, Addium closely monitored social media channels associated with the Defendants and learned that on April 20, 2026 (an apparent play on the 4/20 date and numerical reference to cannabis), TrolMaster debuted its next-generation sensor. This

4912-4904-5680\5

sensor, like the TEROS ONE, is a 3-in-1 sensor that monitors, measures, and reports VWC, EC, and temperature of a growing medium, and incorporates into a greater ecosystem of programmable, automatic watering and fertilizing controllers, specifically engineered for indoor cannabis cultivation.

67.    TrolMaster named this sensor the WCS-9 and, unlike prior generations of TrolMaster's products, employs just the two prongs found on the TEROS ONE. It is pictured below.[11]



68.    While Addium awaited the release of the WCS-9 product to test and determine if, as they had been warned, the product was a knockoff of the TEROS ONE, they found that the pre-release marketing of the WCS-9 revealed the scope of the problem Defendants created by marketing the WCS-2 and WCS-3 capacitance sensors to a market in which the sensors could not operate with reliability.

---

[11] The WCS-9 is the combination of the WN-9 sensor node (pictured to the right in the image above) and the attached two-cable display unit (left in the image above). Both the WN-9 and the WCS-9 are accused of infringement in this action.

69.     Namely, Defendants frankly admitted that the WCS-2 and WCS-3 products were commercial failures, so they would be giving the WCS-9, for free, to anyone who had purchased these prior-generation TrolMaster products. Images supporting the foregoing are below.

70.     These images show that the WCS-9 was intended to restore "trust" and to ensure these customers' continued commercial "support" of TrolMaster. Because the TrolMaster capacitance sensors "didn't perform the way" Defendants intended, they were being given away for free as an act of Defendants "hold[ing]themselves accountable" for their release of faulty sensors, and to "rebuild and instill brand loyalty" in customers who "DID NOT THROW THEM AWAY," even though a bag of 12 such sensors were referred to as "a bag of garbage." *See* circled portions of images *infra*.



12

12 https://www.instagram.com/miami_mango_ca/p/DXXZIB2AV9y/?img_index=1

4912-4904-5680\5





[13] https://www.instagram.com/miami_mango_ca/reel/DWRriecP5P2/
[14] https://www.instagram.com/miami_mango_ca/reel/DWMpCfYvjFv/

4912-4904-5680\5





[15] https://www.instagram.com/miami_mango_ca/p/DXOINCtFXbm/
[16] https://www.instagram.com/mangotech.store/reel/DXXa9bGgYpa/

4912-4904-5680\5

71.     Consistent with these marketing promises, the TrolMaster website now has a webpage allowing for aggrieved owners of the faulty WCS-2 and WCS-3 products to secure a free WCS-9 unit for prior generation units still in their possession.[17]

**Addium Investigates the WCS-9 Product, Discovers it is a Copy of a TEROS ONE Sensor**

72.     Shortly after the April 20, 2026 release of the WCS-9 sensor, Addium purchased and began examining the hardware of the WCS-9 product. What they found was consistent with the tip they had received one year earlier—TrolMaster had reverse engineered every critical hardware aspect of the TEROS ONE. Pictured below and to the left is the circuit board found in the WN-9 sensor of the WCS-9 product. Below and to the right is a schematic of the TEROS ONE printed circuit board.



---

[17] https://www.trolmaster.com/News/WcsUpdateProgram?class=Support

4912-4904-5680\5

73.     Following a close study of the printed circuit board of the WCS-9, and comparing the findings to the TEROS ONE's printed circuit board, Addium's engineers determined that TrolMaster has deployed substantially the same components, in substantially the same arrangement, and using the same component numbering convention as the earlier-released TEROS ONE.  Examples of the foregoing are below, using colored boxes to show the same components and the same naming conventions across the two products.



74.     In addition to the hardware similarities shown above, Addium's engineers determined that the two devices both used the same central processor, a MSP430F5342 component marketed by Texas Instruments.

75.     This level of common hardware componentry, common arrangement of the hardware components, and common naming of the hardware does not occur absent deliberate copying of another's design, even if two devices are intended to perform similar functions.

76.     Having determined that the two devices have substantially the same hardware, Addium's engineers connected to the WCS-9 device to see what the device would reveal about the software it employed.

77.     Initial, conventional efforts to understand the software were largely unfruitful, and likely by design of the TrolMaster product engineers.

78.     Because the WCS-9 product would not respond to conventional software investigation inquiries, Addium's engineers conducted an unconventional approach to uncovering the operation of the WCS-9 product—they removed the main processor from the WCS-9, complete with the firmware stored therein, and installed it into the main processor socket on a TEROS ONE printed circuit board, all to see if the WCS-9's processor would operate on the TEROS ONE's substantially identical printed circuit board.

79.     The results of this experiment were shocking, and entirely consistent with the year-old tip about TrolMaster reverse engineering the TEROS ONE.

80.     Once installed, the central processor from the WCS-9 booted up and made itself available to commands input from Addium's engineers. These engineers input 15 commands that provide known responses in the firmware Addium installed on its TEROS ONE products. In every case—all 15 times—the WCS-9 unit, running the firmware installed by TrolMaster on the WCS-9—returned responses consistent with ordinary operation of Addium's own firmware.

4912-4904-5680\5

81.     Most importantly, the responses to certain commands can only reasonably be explained by TrolMaster making a copy of Addium's firmware found on its TEROS ONE products and installing that same firmware on the WCS-9.

82.     For example, when Addium's engineers input the command [0XB!], which prompts a device running the TEROS ONE firmware to output the identity of the firmware the unit is using, the output revealed that the WCS-9 was running firmware version 1.02.13 with a build date of 2023-11-07. Both results correspond to the specific firmware version employed on the TEROS ONE product, and the date that version was completed.

83.     In response to the command [0XUPS!], which prompts a TEROS ONE product to output an update-capability string, the WCS-9 processor and firmware returned "DECABSL2 601." DECABSL2 is present in v1.02.13 of the TEROS ONE firmware, and is a highly distinct aspect of the firmware—the DECA portion of that response referring to "Decagon Inc" the company Mr. Gaylon Campbell founded in the 1980's.

84.     In response to the command [0I!], which prompts a TEROS ONE product to provide vendor and model identifiers, the WCS-9 processor and firmware returned "013METER TER15 102T15-AL0009439." This is entirely consistent with the results a TEROS ONE product would output in response to the same command—"013METER" indicating that the vendor is METER Group, "TER15" indicating that the device is using the same TEROS 15 firmware as the TEROS ONE products, "102" indicating (as discussed above) that the firmware is from version 1.02 of that firmware, and the "T15-AL0009439" corresponding to the specific identifier burned into the firmware at the TEROS ONE manufacturing facility.

85.     After receiving the foregoing responses from the WCS-9 processor and firmware—all consistent with the operation of the TEROS ONE firmware, and providing responses that the

28

4912-4904-5680\5

WCS-9 product is, essentially, a TEROS ONE product wearing a different housing—the Addium engineers commanded the processor to output its firmware for analysis. Once the firmware was output, the Addium engineers compared it to the firmware found on the TEROS ONE. The results of that analysis show an exact identity between the firmware found on WCS-9 units and the TEROS ONE firmware, version 1.02.13.

86.     Based on the foregoing, and in light of the tipster's warning, Addium has concluded that TrolMaster purchased TEROS ONE units, shipped them to TrolMaster headquarters in Hong Kong, studied them, copied both the hardware and firmware of the TEROS ONE, and are today marketing their knockoff version of the TEROS ONE hardware and firmware as the WCS-9 and WN-9 sensor products.

87.     Addium also hired a third party, UnitedLex to conduct a hardware analysis of the WCS-9 printed circuit board, in comparison with the TEROS ONE printed circuit board. The findings of this analysis are consistent with Addium's conclusion that the WCS-9 is a studied imitation or knockoff of the TEROS ONE.

**TrolMaster's Copy of the TEROS ONE Violates Plaintiffs' Patent Rights**

88.     While reverse engineering another's product is not *per se* unlawful, it is a civil tort if the product that was reverse engineered is protected by patent and copyright registrations, as is the case for the TEROS ONE.

89.     As discussed above, METER Group sought and secured patent protection for the TEROS ONE product following development of that product, rights which issued near the time METER Group and Addium became independent companies.  Today, Addium is a licensee of the '612 Patent, with rights to enforce the same.  Neither METER Group nor Addium have extended a license to the '612 Patent to TrolMaster or any other Defendant in this action.

4912-4904-5680\5

90.     Attached as **Exhibit D** is a claim chart that demonstrates on a limitation-by-limitation basis, how the TEROS ONE product and the knockoff WCS-9 product practice each limitation of multiple claims (the "Asserted Claims") of the '612 Patent.

91.     Because the WCS-9 and WN-9 products practice each limitation of the Asserted Claims, each product infringes METER Group and Addium's exclusive rights under the '612 Patent.

92.     Defendants individually infringe each Asserted Claim based at least on the following acts:

a.      Defendant TrolMaster directly infringes each Asserted Claim at least by manufacturing, testing, using, selling, offering for sale, and/or importing the WCS-9 and/or WN-9 products in the United States.  For example, TrolMaster owns and operates www.trolmaster.com, where the WCS-9 and WN-9 sensors are marketed and made available for purchase. As discussed below, these sales are effected by TrolMaster's domestic subsidiary, Defendant ThinkGrow and/or the Mango defendants. *See, e.g.*, https://www.trolmaster.com/Products/Details/WCS-9 (listing ThinkGrow as the entity responsible for orders and shipping for products marketed by TrolMaster).

b.      Defendant ThinkGrow directly infringes the Asserted Claims by testing, using, selling, offering for sale, selling, and/or importing the WCS-9 and/or WN-9 in the United States. As an example of the foregoing, www.trolmaster.com lists Defendant ThinkGrow as being responsible for orders and shipping of its products.

c.      On information and belief, Defendants Mango Trol Labs, Mango Tech Store, and Mango Trol Inc., while nominally separate companies, operate as a monolith. Each lists Mr. Alejandro Villegas as CEO, each lists Ka Suen Chan as an executive (so,

30

4912-4904-5680\5

too, does ThinkGrow) and each shares facilities on Florin Perkins Road in Sacramento California.  On information and belief, the Mango family of companies operates, together with Defendant ThinkGrow, as the domestic marketing and sales entity for TrolMaster products in the United States. For example, the WCS-9 and WN-9 products are offered for sale at https://mangotech.store/products/wcs-9-substrate-sensor-temp-ec-volumetric-water-content, which currently lists a two-to-three-week delay in shipment due to high demand.

93.     In addition to the foregoing direct infringement allegations, and by virtue of receipt of this Complaint, each Defendant has knowledge of the '612 Patent, as well as the copying and infringement allegations found herein.  Further sales, offer of sale, importation, use, and testing of the WCS-9 and WN-9 products constitute willful infringement of the '612 Patent.

94.     Additionally, each Defendant commits indirect infringement through inducement and/or contributory infringement. For example, the WCS-9 and WN-9 have no substantial non-infringing use outside of the operation claimed in the Asserted Claims—using the hardware recited therein and found in the WCS-9 and WN-9 products to perform the measurements recited and claimed in the Asserted Claims.  As another example, and with knowledge of the '612 Patent at least by virtue of service of this Complaint, any further acts of sale, offer of sale, or product support constitute induced infringement, as Defendants have knowledge of Plaintiffs' infringement allegations and intend for their customers to nevertheless purchase and use the WCS-9 and WN-9 products in the manner claimed in the Asserted Claims.

**TrolMaster's Copy of the TEROS ONE Firmware Infringes Plaintiffs' Copyright Rights**

95.     Addium has had copyright rights in its improvements to the TEROS ONE firmware since they were committed in November of 2023.  When Addium performed the firmware analysis

31

described above and realized that the WCS-9 employed a direct copy of that firmware, it applied for and received a registered copyright for the same version of that software deployed on both the TEROS ONE and the WCS-9/WN-9 products—v1.02.13 of the TEROS 15 firmware.  That copyright registration is attached hereto as **Exhibit E.**

96.     Defendants had and have no good-faith belief that their copying and distribution of Plaintiffs' copyrighted firmware did not constitute copyright infringement. Defendants' infringement was willful, intentional, and purposeful, in disregard of and with indifference to Plaintiffs' rights. Defendants either had actual knowledge that their conduct constituted copyright infringement or acted in reckless disregard of Plaintiffs' statutory rights.

97.     Because Defendants have copied this copyrighted firmware, Defendants engage in copyright infringement of the same each time they manufacture or sell WCS-9/WN-9 product with that firmware, each such unit containing and using an unlicensed copy of the TEROS ONE's copyrighted firmware.

**Plaintiffs Are Being Irreparably Harmed by Defendant's Willful, Egregious IP Infringement**

98.     Defendant's acts of patent and copyright infringement have caused and are causing irreparable harm to Plaintiffs.

99.     For example, Defendants market and sell the WCS-9 and WN-9 products at $199 and $119 dollars, respectively.  Plaintiffs ordinarily sell their competing TEROS ONE sensors for as much as twice these prices. Because Defendants are selling what is essentially a clone of the TEROS ONE product, Plaintiffs are losing and will lose the ability to maintain the price point it has established over the last 2.5 years on the market.

100.    Additionally, as much as 30% of Addium's revenue associated with its TEROS ONE product comes from software licenses to data intelligence software designed to intake

TEROS ONE data, make it available to the grower, and to make intelligent, automated irrigation and fertilization decisions based on that data. Plaintiffs will lose these revenues in an unknown amount corresponding to the customers they lose in competition with Defendants' knockoff products.

101.    Defendants are explicitly marketing their knockoff products on the basis that they do not require any licensed software to operate, further eroding Plaintiffs' ability to set and maintain prices for its competing products and the residual income generated by sale of the TEROS ONE.

102.    Prior to Defendants' introduction of the knockoff WCS-9 and WN-9 products, the TEROS ONE was the sole growing medium sensor designed and capable of consistently providing accurate VWC and EC measures in the highly fertilized environments common to indoor cannabis cultivation.  Now that Defendants have copied and re-skinned the TEROS ONE product as a TrolMaster "breakthrough", Addium lost its position as the sole provider of products engineered for the unique growing conditions of the cannabis cultivation market, forcing Addium to compete against its own technology, ceding market share and reputational benefit to a copyist.

**FIRST CLAIM FOR RELIEF**
**(Infringement of Copyrighted Software Under 17 USC §§ 106 and 501)**

103.    Plaintiffs reallege and incorporate by reference all of the preceding allegations of this Complaint.

104.    The Copyright Act, 17 U.S.C. §§ 106 and 501, imposes liability on any person or company that, without permission of the copyright owner, reproduces or distributes copyright protected material.

33

4912-4904-5680\5

105.    METER Group is the owner of US Copyright Registration Number TX 9-601-758, which is valid and subsisting. This copyrighted work includes improvements in v1.02.13 of the TEROS ONE firmware found on the TEROS ONE devices, which Defendants have copied and distributed in memory of the WCS-9 and WN-9 products.

106.    Defendants are selling Plaintiffs' copyright-protected material without any license, authorization, permission, or consent, in violation of 17 U.S.C. §§ 106 and 501.

107.    Defendants' acts of infringement are willful, intentional, and purposeful, in disregard of and with indifference to Plaintiffs' rights for reasons explained *supra*.

108.    As a direct and proximate result of Defendants' infringement, Plaintiffs have suffered and will continue to suffer irreparable harm, as well as monetary damages in an amount to be proven at trial.

109.    Plaintiffs are entitled to recover all damages caused by Defendants' infringement of their copyright rights, including enhanced statutory damages, together with prejudgment interest and costs for Defendants' wrongful conduct.

110.    Plaintiffs have no adequate remedy at law to prevent future infringement of the Copyrighted Software.  Plaintiffs have suffered and continue to suffer irreparable harm as a result of the Defendants' infringement and is, therefore, entitled to preliminary and permanent injunctive relief to enjoin Defendants' wrongful conduct.

**SECOND CLAIM FOR RELIEF**
**(Patent Infringement Under 35 USC §§271(a-c)**

111.    Plaintiffs reallege and incorporate by reference all of the preceding allegations of this Complaint.

4912-4904-5680\5

112.    The law imposes liability on those who make, use, sell, or offer to sell a patented invention without permission anywhere in the country. 35 U.S.C. § 271(a). It also imposes liability on those who induce another to infringe or who materially contribute to another's infringement. 35 U.S.C. § 271(b),(c).

113.    Defendants make, offer for sale, sell, import, and/or use the WCS-9 and WN-9 sensors, which practice all limitations of the Asserted Claims of the '612 Patent, which is valid and subsisting.  Pursuant to 35 U.S.C. § 282, the claims of the '612 Patent are presumed valid.

114.    At least from the date of filing of this Complaint, Defendants' acts of patent infringement are willful, intentional, and purposeful, in disregard of and with indifference to Plaintiffs' patent rights.

115.    The Defendants' infringement of the '612 patent has caused and continues to cause monetary and non-monetary damage and injury to Plaintiffs.

116.    Plaintiffs are entitled to recover all damages caused by the Defendants' infringement of the '612 Patent, whether as a reasonable royalty or lost profits, to the fullest extent the Patent Act allows, together with prejudgment interest and costs for Defendants' wrongful conduct.

117.    Plaintiffs have no adequate remedy at law to prevent future infringement of the '612 Patent.

118.    Plaintiffs have suffered and continue to suffer irreparable harm because of the Defendants' patent infringement and are, therefore, entitled to preliminary and permanent injunctive relief to enjoin the Defendants' wrongful conduct.

119.    Plaintiffs are entitled to enhanced damages and attorneys' fees and costs under 35 U.S.C. §§284 and 285.

35

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that:

A.      The Court hold that Defendants are liable for copyright infringement;

B.      The Court preliminarily and permanently enjoin Defendants and all of their officers, directors, principals, agents, servants, employees, successors, assigns, and anyone else acting in concert or active participation therewith, from infringing Plaintiffs' copyright;

C.      The Court order Defendants to destroy all copyright infringing material in its possession which bears any of the Copyrighted Firmware or derivatives thereof, and to certify under oath to the Court that such destruction has taken place;

D.      The Court order Defendants to account for and relinquish to Plaintiffs all gains, profits, and advantages derived by Defendants' copyright infringement alleged herein pursuant to 17 U.S.C. § 504;

E.      The Court order Defendants to pay to Plaintiffs such damages as Plaintiffs have sustained as a consequence of the Defendants' copyright infringement alleged herein pursuant to 17 U.S.C. § 504;

F.      The Court order Defendants to disgorge all ill-gotten gains to the extent of its unjust enrichment as a result of its copyright infringement alleged herein, and impose a constructive trust upon any or all property and money that is in Defendants' possession and control as a result of its copyright infringement alleged herein;

G.      The Court issue an award of statutory damages for each infringed work, enhanced for willful infringement up to the maximum amount of $150,000 per work, pursuant to 17 U.S.C. § 504(c)(2);

36

H.      The Court order Defendants to pay to Plaintiffs all costs of this action, together with reasonable attorneys' fees pursuant to 17 U.S.C. § 505;

I.      The Court enter judgement against Defendants for infringement of the '612 patent under 35 U.S.C. § 271;

J.      The Court preliminarily and permanently enjoin Defendants and all of its officers, directors, principals, agents, servants, employees, successors, assigns, and anyone else acting in concert or active participation therewith, from selling, offering for sale, manufacturing, or using any device that infringes the '612 patent;

K.      The Court order Defendants to issue a recall notice to all customers with products having Plaintiffs' copyrighted firmware and/or which embody patented technologies of the '612 patent;

L.      The Court order Defendants to account to Plaintiffs for all sales, revenues, and profits derived from the sale of the infringing products or any other products that infringe the '612 patent, and that Defendants pay to Plaintiffs all compensatory damages to which Plaintiffs are entitled by law, including without limitation lost profits, reasonable royalties, price erosion damages, and convoyed sales and entire market value sales damages;

M.      The Court order Defendants to pay to Plaintiffs three times the damages suffered in this case, pursuant to 35 U.S.C. § 284 for Defendants' willful patent infringement;

N.      The Court order Defendants to pay to Plaintiffs all prejudgment interest on all sums allowed by law pursuant to 35 U.S.C. § 284;

O.      The Court find this case to be exceptional under 35 U.S.C. § 285 and order Defendants to pay to Plaintiffs all costs (including any expert witness fees), disbursements, and reasonable attorneys' fees incurred in this action and such other relief as may be appropriate; and

37

4912-4904-5680\5

P.    The Court award Plaintiffs such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues so triable.

DATED this 1st day of July, 2026        Respectfully submitted,

DORSEY & WHITNEY LLP

*s/ Elliot Hales*
Elliot Hales
Brett Foster
Ian Swan
*Attorneys For Plaintiffs*

4912-4904-5680\5